**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

TERRY THOMPSON,

    Plaintiff,

    v.

CPL. C. OPOKU,
CPL. A. HAYNES,
CPL. D. GARNETT,
CPL. T. RENE,
CPL. D. MORGAN,
CPL. K. MOORE,
SGT. D. GADSON,
CPL. JACKSON,
CPL. LEWIS,
CPL. STANBACK,

    Defendants.

Civil Action No.: ELH-18-1022

**MEMORANDUM OPINION**

Terry Thompson, the self-represented plaintiff, is a Maryland prisoner confined at the

Maryland Correctional Training Center ("MCTC"). He filed suit under 42 U.S.C. § 1983 against

a host of defendants: Charles Opoku, Aisha Haynes, Derrick Garnett, Tylicia René,[1] Daniel

Morgan, Kurt Moore, Dean Gadson, Andrew Jackson, William Lewis, and Stephen Standback,

employees of the Prince George's County Detention Center ("PGCDC") (collectively, the

"Correctional Defendants"), as well as Saba Asrat and Corizon, Inc. ("Corizon") (collectively, the

---

[1] Defense counsel spells the surname as "Renee." *See* ECF 50; ECF 50-1. However, in her Affidavit, the defendant uses the spelling of "René." *See* ECF 50-13.

Tylecia René should not be confused with Officer Jules René. I shall use initials of first names to distinguish between Jules and Tylecia René.

"Medical Defendants"). ECF 1.[2] Plaintiff alleges that on September 28 and September 29, 2015, while he was a pretrial detainee at PGCDC, he was assaulted by the Correctional Defendants. Further, he complains that the Medical Defendants deprived him of constitutionally adequate medical care for the resulting injuries. ECF 1.

The Medical Defendants previously moved to dismiss or, in the alternative, for summary judgment. ECF 20. By Memorandum Opinion (ECF 39) and Order (ECF 40) of May 14, 2019, I granted summary judgment in favor of Corizon and Asrat with respect to plaintiff's claim regarding his post-assault medical care. ECF 39; ECF 40.

Defendants Opoku, Haynes, Garnett, T. René, Morgan, Moore, Gadson, Jackson, Cpl. Lewis, and Stanback have moved to dismiss or, in the alternative, for summary judgment with respect to plaintiff's excessive force claim. ECF 50. The motion is supported by a memorandum (ECF 50-1) (collectively, the "Motion") and 26 exhibits, totaling over 450 pages, and including two videos.

Curiously, the Correctional Defendants do not address the assaults that allegedly occurred on September 29, 2015. Rather, they focus solely on the cell extraction performed by the Emergency Response Team ("ERT") on September 28, 2015. That team appears to have consisted of Officer Chandler Hines, Sergeant Gadson, Officer Garnett, Officer Morgan, Officer Moore, and Officer J. René. ECF 50-1 at 4.[3] Thompson opposes the Motion (ECF 54; ECF 60), and has submitted exhibits. Defendants have replied. ECF 58.

---

[2] The Clerk shall amend the docket to reflect the full and complete spellings of defendants' names.

[3] Curiously, neither J. René nor Hines is named as a defendant.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part. Plaintiff will be granted 28 days to file a motion for appointment of counsel.

## I.    Factual Background

### A.

In addressing the motion previously submitted by the Medical Defendants, I summarized some of the pertinent facts. *See* ECF 39 at 2-4. I shall restate that summary here, and then supplement it, as necessary.

> Plaintiff was 23 years old at the relevant time. ECF 26-2 at 36. He alleges that on September 28, 2015, while housed at the Prince George's County Detention Center, he asked correctional officer Opoku for a pencil, but Opoku signaled him to "'go away.'" ECF 1 at 7. Plaintiff next asked officer Best for a pencil, but Opoku prevented Best from providing the pencil and again told plaintiff to "'go away'" and directed plaintiff to return to his cell. *Id.* As plaintiff walked away, Opoku followed him and the two exchanged words. *Id.* Opoku raised his left arm, hitting plaintiff's shoulder with his hand. *Id.* Plaintiff reacted by striking Opoku in the face with a closed fist, knocking him unconscious. *Id.*

> Officer Haynes pushed plaintiff into his cell and stated, "'now they are about to come fuck you up.'" *Id.* Haynes left and then within one minute an emergency response team ("E.R.T.") came to plaintiff's cell. *Id.* Plaintiff "stuck his hands out of the slot" in order to be handcuffed, but he was directed by an officer to "get on the ground." *Id.* Plaintiff responded that he would come out of the cell and get on the ground. *Id.* An unidentified officer then lifted his mace in an attempt to spray plaintiff. *Id.* Plaintiff backed away from the cell door, which then opened, and plaintiff, who had been talking to his cellmate, "balled up to protect his face . . . ." *Id.* The officers then entered his cell and stomped, kicked, punched, and maced him. *Id.* at 7-8. Plaintiff states that the officers continued to "beat" him even after he was handcuffed, and also maced him. *Id.* at 8.

> After the altercation, plaintiff was escorted to the medical unit by staff and seen by Nurse Saba Asrat. *Id.* Plaintiff advised Asrat that his "face and back hurts like hell" but Asrat said he was "'ok'" and he was placed in the medical unit holding cell. *Id.* Plaintiff states that he was bleeding and in "very bad shape." ECF 26 at 8. Because it was the change of shift, plaintiff was placed in an isolation cell in the medical unit. ECF 1 at 8. Later that evening, plaintiff went to the glass at his cell and sought help from an unidentified nurse, telling

her that he believed something was broken and he needed x-rays. ECF 26-3, ¶ 10. She responded that it was late and that she would need to call the doctor. *Id.*

Later that day, when a correctional officer sought to have plaintiff moved to housing unit H-5, solitary confinement, he was seen by another nurse who was responsible for clearing him for the move. ECF 1 at 8. Plaintiff threatened to kill himself and the nurse instructed the officers to place him back into the medical isolation cell, where he was put on suicide watch. *Id.* Due to plaintiff's threats of self harm, plaintiff was seen by Dr. Hernandez. ECF 26-1, ¶ 11. He advised Hernandez that he was afraid of the E.R.T. officers who had threatened him, telling him they were not done with him. *Id.* Plaintiff also told Hernandez that he needed medical attention because his face and back hurt badly. *Id.* Hernandez indicated he would relay the information to medical staff. *Id.*

Plaintiff alleges that on September 29, 2015, while being escorted by Officer Jackson, he was placed "under a camera" and assaulted by Officers Jackson, Lewis and Standback. ECF 1 at 8. After the assault, further along in his escort, Jackson again placed plaintiff "under a camera" and assaulted him again. *Id.*

On October 1, 2015, plaintiff was seen by a nurse and doctor. *Id.* at 9. He reported face, jaw, and back pain. *Id.* X rays were ordered. *Id.* Plaintiff was transported to the emergency room that evening. Plaintiff advised emergency room personnel that he was in an altercation two days earlier, although the hospital record also says that the pain began four days earlier. ECF 26-2 at 35. The emergency room notes reflect that plaintiff offered no complaints, except pain to his lower neck. *Id.* at 36.

Examination of plaintiff's head, eyes, and nose were all normal, with a note that the head was atraumatic. *Id.* at 37. Tenderness was observed over plaintiff's back. *Id.* He was prescribed Percocet for pain relief. *Id.*

Plaintiff had a "primary diagnosis" of "spinous process fracture of C7 and T1 after assault" and received a prescription for Ibuprofen. *Id.* at 36. The "Doctors Notes" stated, *id.*: "Not an unstable fracture, pain controlled and no neuro deficits or risk of further injury. Patient can wear collar for comfort and f/u with NSGY (Amini). Pain control as well." *Id.* Similarly, the discharge notes indicated a "stable fracture, but can be painful." *Id.* at 40. And, the discharge notes further reflect that plaintiff had facial swelling and pain. *Id.*

A CT scan indicated that, in addition to the fractures at C7 and T1, "There is bilateral nasal bone fractures. There is an old left orbital wall fracture" *Id.* at 40.

Mr. Opoku was hospitalized for several days.  ECF 50-10 at 21.  He suffered a subdural hematoma and a fractured skull.  *Id.* at 22.  As noted, plaintiff also claims that he suffered serious injuries due to the assaults on him.

On October 1, 2015, the PGCDC initiated an investigation of the incident involving the alleged attack on Thompson by the correctional officers.  The investigation began after Captain Gregory Smith received notice that plaintiff had sustained an injury.  ECF 50-4 at 31.  Lieutenant William Rorls, who is employed by the Prince George's County Department of Corrections, assigned to the Office of Professional Responsibility and Legal Affairs, interviewed "all the witnesses."  ECF 50-4 at 2-4 (Declaration of William Rorls).  At the conclusion of the investigation, he determined that the force used against Thompson was reasonable.  ECF 50-4 at 3, ¶ 14.

Officer Dennis Best told Rorls during his interview that while plaintiff was at the Officer's Station, he began to yell at Opoku and then refused to go to his cell.  ECF 50-4 at 41.  Opoku and Haynes escorted plaintiff upstairs, where his cell was located.  *Id.*  Once they reached the top of the stairs, plaintiff struck Opoku twice in the face with a closed fist.  *Id.* at 42.  According to Best, as well as Officer Haynes, plaintiff had not presented any problems with any officers prior to this incident.  *Id.*; *see also id.* at 35 (interview notes for Aeisha Haynes).

The members of the ERT claimed that they entered plaintiff's cell after he refused to comply with orders to step away from the door, get down on his knees, and put his hands behind his back.  ECF 50-4 at 32-34, 37-38 (witness statements by Hines, J. René, Moore, Garnett, and Gadson).

Corporal Jules René recalled that he responded to a Signal 13 call (*i.e.*, a distress call) on September 28, 2015, and saw Corporal Opoku "lying by the steps on the second floor . . . ." ECF 50-4 at 33. He did not witness the altercation between Thompson and Opoku, however. *Id.*

J. René was the first officer to enter plaintiff's cell (ECF 50-21 at 7, lines 96-97). He admitted in his undated Affidavit that he delivered several blows to plaintiff. *See id.* at 3, ¶¶ 8, 9. He claimed that he used "knee strikes and punches to restore order" and "to get [Thompson] to comply with . . . orders so that he could be handcuffed." *Id.* ¶ 9. In his interview of November 3, 2015, J. René explained that he gave multiple orders to Thompson "to get down on the floor, and place his hands behind his back," but Thompson "refused all orders." ECF 50-4 at 33.

In his interview of November 3, 2015, J. René also stated that Gadson sprayed plaintiff with "O/C pepper foam,"[4] which enabled the team to put handcuffs on plaintiff. *Id.* at 34. He asserted that no force was used after Thompson was placed in handcuffs. *Id.*

Moore responded to the Signal 13 and saw Opoku on the top tier by cell 224, "lying unconscious." ECF 50-4 at 34. He recalled that, in response to the orders given by the ERT, plaintiff said "he was not going to be handcuffed, and he was not going out like that." *Id.* Further, Moore claimed that plaintiff attempted to strike members of the ERT. *Id.* The ERT attempted a takedown to get plaintiff on the floor. *Id.* But, Moore denied that any force was used. *Id.* at 35.

In his Affidavit (ECF 50-14), Moore stated that he was the camera operator and gave no orders to Thompson. *Id.* ¶ 12. He denied having witnessed the use of force by ERT members. *Id.* ¶ 14.

---

[4] "Oleoresin Capsicum" is "[a]n inflammatory agent made from the oil resin of Cayenne Pepper." ECF 50-4 at 15 (County Correctional Center Policy and Procedure Manual).

Officer Hines's role in the cell extraction was to watch plaintiff's cellmate to ensure he did not become involved. ECF 50-4 at 32. At his interview on November 3, 2015, Hines denied that he used force against plaintiff, but he overheard several ERT members ordering plaintiff "to place his hands behind his back." *Id.*; *see also* ECF 50-20 at 3, ¶ 9.

Officer Garnett stated that he responded to a "Signal 13," *i.e.*, a distress call. *Id.* at 37. He saw Opoku on the floor. *Id.* He claimed that plaintiff refused an ERT order to kneel down and put his hands behind his back. *Id.* According to Garnett, as ERT entered the cell, plaintiff attempted "forcibly" to push past the ERT. *Id.* In response, Garnett struck plaintiff in the face an unspecified number of times, "to gain control of him and to get him to release the ERT member . . . he was holding." *Id.*

Sgt. Gadson, who was the ERT leader, did not mention the use of a chemical agent during his interview with Rorls. *See id.* at 37-38; 68-73 (interview of Gadson). But, he stated in his Affidavit that he sprayed plaintiff twice with "O.C." during the cell extraction, because plaintiff was "combative and unruly." ECF 50-24 at 4, ¶¶23-24.

Apparently, Officers Lewis, Jackson, and Stanback were not interviewed. All three have submitted affidavits.

In Lewis's affidavit (ECF 50-15), he avers that he was assigned to the ERT on September 28, 2015. *Id.* ¶ 5. But, he claims he did not witness the incident or have any contact with Thompson on that date, or thereafter, in which force was used. *Id.* ¶ 7.

Similarly, Jackson was assigned to the ERT on September 28, 2015. ECF 50-16 (Affidavit), ¶ 5. But, he avers that he "was not on duty on the date of this incident." *Id.* ¶ 5.

And, Stanback was also assigned to the ERT at the relevant time. ECF 50-17 (Affidavit), ¶ 5. However, he was not on duty on September 28, 2015. *Id.* ¶ 6.

The officers who were interviewed could not recall if plaintiff said anything during the cell extraction. ECF 50-4 at 32, 34, 35, 37, 38. But, when the bodycam video was reviewed with each officer during the interviews, all of the officers admitted they could hear plaintiff say "My neck." *Id.* For example, Hines viewed the body cam video of the incident and heard plaintiff say, "'My neck.'" ECF 50-20, ¶ 9.

According to the officers, after the incident, plaintiff was escorted to the medical unit. *Id.* Moore claimed that the attending nurse at the medical unit where they took plaintiff said plaintiff had an existing injury to his neck, sustained while he was incarcerated at the District of Columbia jail, but Moore could not provide the name of the nurse who allegedly made that statement. *Id.* at 35.

Sergeant Tylicia René was also interviewed by Rorls and related that she had responded to the "Signal 13 (Officer needs assistance)" on September 28, 2015. ECF 50-4 at 40. She witnessed the ERT give orders to plaintiff to get down on the floor, but plaintiff refused to comply. *Id.* at 41. T. René added that she heard plaintiff say that "Cpl. Opoku deserved to get knocked out." *Id.*; *see id.* at 49. Further, she observed plaintiff being removed from the cell in handcuffs, and she related that he did not make any complaints after he left the cell. *Id.* at 41. But, she also stated that plaintiff refused to speak with her. Two days after the incident, plaintiff told T. René that "he was not sure if Cpl. Opoku was going to do something to him," and he claimed he did not know that he could be criminally charged for assaulting an officer. *Id.*

The Prince George's County Department of Corrections Policy and Procedure Manual outlines guidelines for the use of force by Correctional Officers. The "levels of force" available to officers begin with a "Show of Force (i.e., officers presence and/or K-9 if immediately available)." ECF 50-4 at 15, §IV.B.1. The options escalate to issuing verbal commands; passive

control techniques; deployment of pepper foam; punches and kicks; use of impact weapons and strikes (e.g., riot baton, night sticks, pepperball gun); use of K9; and lethal force (use of firearms). *Id*. at 15-16.  The Manual cautions: "In all instances of use of force, the officer must be aware of certain variables which could cause the escalation or de-escalation of the situation."  *Id*. at 16.  The variables officers are to consider include whether the person is in full restraints; the size, age, and demeanor of the subject; the available assistance to the officer; the environmental conditions; and the time available for resolution of the problem.  *Id*.  Deployment of pepper foam is prohibited where an inmate is in "passive resistant" and is limited to circumstances where "other means of force may cause undue injury to the inmate or staff member."  *Id*. at 21.  In instances where an ERT is involved in a "staged or planned action," the leader of the team is directed to "contact medical staff to inquire about the medical condition of the involved inmate," but the inquiry is limited to "any possible complications for the use of" pepper foam.  *Id*. at 22.

## B.

Plaintiff was interviewed by Lt. Rorls on December 16, 2015.  ECF 50-4 at 38.[5]  According to plaintiff's account, when the ERT came to his cell door and ordered him to get down on the ground, he responded: "If ya'll gonna come in here and beat me.  Ya'll might as well let me come out and get on the ground."  *Id.* at 39.

Thompson put his bed sheets at the bottom of the door because he suspected a chemical agent would be deployed, and said he was standing by the wall near the door when the ERT entered the cell.  *Id*.  He admitted that he did not comply with orders from ERT before they entered his cell, and replied "no" when they told him to get on the ground.  *Id*. at 65.

---

[5] There appears to be an omission in the summary; the bottom of ECF 40 at 38 and the top of ECF 40 at 39 reflect that the text is not complete.

According to plaintiff, the ERT members came through the door "swinging at him, but they could not get to him because he eased down to the floor and curled up in a ball." *Id*. at 39. Plaintiff claimed that the ERT then began to "stomp and kick him" as they "ordered him several times to stop resisting." *Id*. He felt blows to his face, back, and neck. *Id*. at 40. When plaintiff heard someone outside of the cell say "that's enough," he claims he was handcuffed and, after he was restrained, he was sprayed with pepper foam. *Id*.

Thompson asserted that when he was lifted to his feet by the ERT members, he immediately felt pain. *Id.* When he raised his head, he felt pain from his neck down his back. *Id*. Plaintiff reported to the nurse that his "face, jaw and neck were aching" after he was decontaminated from the pepper foam. *Id*.

Plaintiff also stated in his interview that "ERT kept coming to the . . . cell window" after he was placed in the isolation cell. ECF 50-4 at 58. When one of the officers said, "'see you soon'" plaintiff asked him why, and the officer allegedly said "'Oh, you gonna find out'" and "'[w]e're gonna have a long bumpy ride.'" *Id*.

Thompson was escorted to the Captain's office. *Id.* During the escort, he claims that Corporal Morgan and Lewis repeatedly punched him in the stomach and ribs as he was going through a metal detector. *Id*. As the three men began to walk again, plaintiff claims Morgan began assaulting him again. *Id*.[6] After plaintiff spoke with a detective, Morgan came back to escort him back to the isolation cell. *Id*.

---

[6] The meaning of what plaintiff says in the transcript of his interview is difficult to discern. He states, "Then Corporal (Morgan) started putting it on my head. As you can see, I don't have no dreads right here. He started putting it on my head. So I didn't know that he was popping 'em out." ECF 50-4 at 58, lines 210-12.

Plaintiff related that Morgan put the handcuffs on his wrists so tight that his fingers went numb and, when he complained, Morgan told him to "'shut up.'" *Id*. As they walked down a hallway toward medical, they reached an area outside of an exam room where there is a wall and Morgan "put [plaintiff] on the wall." *Id*. at 59. Morgan also said, "'Every time you see us in black we gonna beat your ass.'" *Id*. When plaintiff retorted with, "I don't know, I go to court October 23," he claims that Morgan reiterated the threat and ordered him to get on his knees. *Id*. Once plaintiff got down on his knees, Morgan began "kneeing [him] in [his] face, and [his] head hit the wall." *Id*.

According to plaintiff, the assault stopped briefly when Morgan apparently heard something and ordered plaintiff to get up. *Id*. However, when it was clear there was no one around, Morgan ordered plaintiff to get on his knees again, but did not wait for him to comply; he pulled plaintiff to his knees by the handcuffs. *Id*. Morgan then resumed kneeing plaintiff again, causing his head to hit the wall again. *Id*. When the nurse came to the area, plaintiff was ordered to stand again and the officer asked the nurse if he was ready to go back to the housing unit. *Id*. Because threats were made to plaintiff that he would be assaulted again after he was put back into the housing unit, plaintiff told the nurse he would kill himself if they put him back in the housing unit. *Id*. Plaintiff was placed in a suicide watch cell. *Id*.

When the midnight shift came on duty, plaintiff asked for an x-ray of his neck and spine, but was told the doctor would need to be contacted. ECF 50-4 at 60. He claimed that Corporal Jackson and Lewis were also working the midnight shift and came to escort him to be fingerprinted and to see the commissioner. *Id*. When Jackson and Lewis told plaintiff he was being charged with first degree assault, plaintiff indicated he wanted to see his lawyer. *Id*. According to plaintiff

this angered Jackson and Lewis. He recounted: "So they grabbed me . . . they took me through a door." *Id*.

Two surveillance cameras are located in the area outside the door and plaintiff claims that Jackson "started adjusting [him] under the camera." *Id*. Plaintiff said, "The ERT officer nodded to him, like, in agreeing of the location he place[d] me . . . . And they're all agreeing to tell him to go ahead, the hallway's clear." *Id*.

A call came over the radio indicating the commissioner wanted to see plaintiff. *Id*. at 60-1. Plaintiff recalls being worried about what would occur after his appearance before the commissioner and that he "signed the papers or whatever." *Id*. at 61.

Lewis and Jackson escorted plaintiff for fingerprinting, then took him back through the door, placed him under the camera, and "with no hesitation" Jackson and Lewis began punching him in the face. ECF 50-4 at 61. The assault was briefly interrupted when other inmates were seen approaching the area and plaintiff was taken from under the camera and put against the wall. *Id*. Plaintiff claims that Jackson then put him back under the camera and started hitting him again, in the face and in the stomach. *Id*. Plaintiff was then escorted back to the medical ward. *Id*.

The following day, plaintiff was seen by a doctor who ordered x-rays of his face and neck due to his complaints that his jaw and neck hurt. ECF 50-4 at 61-2. Morgan came to escort plaintiff and plaintiff claims that Morgan punched him in the stomach and ribs four times and then punched him on the right side of his face once. *Id*. at 62. Throughout the interaction, plaintiff said that Morgan made it clear that he was retaliating against him for assaulting Opoku. *Id*. at 62-3.

Plaintiff recalled that he told the doctor performing the x-rays that the pain started the day the ERT came into his cell and beat him. *Id*. at 63. He also recalled that a supervisor asked him if the ERT officers were "'still putting hands on [him]?'" *Id*. Plaintiff related the assaults he

endured from Jackson, Lewis, and Morgan. *Id.* The supervisor, whose name plaintiff could not recall, said he was going to get him "'out of here.'" *Id.* Plaintiff was then taken "to the hospital" by paramedics. *Id.*

## C.

In support of their Motion, the Correctional Defendants rely heavily on two videos. The first, referred to as the "Milestone Video," consists of footage without audio from several different surveillance cameras in plaintiff's housing unit, recorded on September 28, 2015. ECF 50-5. The second video is footage from body cameras worn by three different ERT officers during the cell extraction on September 28, 2015. ECF 50-8.

The Milestone Video shows plaintiff striking Opoku and Opoku falling backward, hitting the concrete floor. ECF 50-5 at 10.220.30.103. It is unclear whether Opoku touched plaintiff as he alleges, but during plaintiff's criminal trial for assault on a correctional officer, Opoku admitted that his "hand did touch [plaintiff]." ECF 54-2 at 64, lines 14-17. After Opoku was knocked unconscious, Officer Haynes pushed plaintiff into his cell, Cell 226. ECF 50-5 at 10.220.30.103; *see also* ECF 54-2 at 67, lines 8-14. The Milestone Video is not particularly revealing about the cell extraction itself.

The body camera video consists of three separate video sequences and includes audio. ECF 50-8. The first video sequence appears to be the body camera worn by Hines, who is also seen holding a video camera in the second and third sequences.[7] Hines was standing near plaintiff's cell door as orders were issued to plaintiff to get away from the door to his cell, which was closed. ECF 50-8, Part 1 at 1:38. A short time later, an officer who appears to be J. René tells Hines to

---

[7] The video recorded with the video camera does not appear to have been submitted to the court.

"cut that shit off," seemingly referring to the video camera Hines was holding. *Id.* at 2:36  Hines responded that it was "already on." *Id.*

Opoku was placed on a stretcher and taken away by J. René and Garnett.  Six officers assembled on the tier outside plaintiff's door.  *See* ECF 50-8, Part 3.

The second video sequence appears to be from a body camera worn by one of the officers who went into the cell to restrain plaintiff.  In the second video, plaintiff is told to get on his knees.  Plaintiff says twice, "Let me come out." *See id.* at 7:58; 8:01.  Also, plaintiff said his hands were behind his back. *See id.* at 7:55.  At about 8:01, officers went into the cell.  Plaintiff was standing up, at the door.  A fracas ensued.[8]  The video ends as handcuffs are placed on plaintiff.  ECF 50-8 at Part 2.

In the third video sequence, the officers direct plaintiff to get on his knees.  Plaintiff can be seen standing next to the door; when the door to his cell is opened.  Plaintiff goes down to the floor and the first officer who enters the cell begins punching him.  ECF 50-8, Part 3 at 8:45.  After a struggle on the floor, during which plaintiff appears to be face down on the floor, plaintiff can be heard saying "my neck." *Id.* at 9:18, 9:24.  An officer said "O.C. up." *See id.* at 9:22.  The officers and plaintiff begin to cough. *Id.* at 9:23.  Gadson is then heard saying "handcuff him." *Id.* at 9:42.

The remaining footage on sequence one and three depicts plaintiff being escorted through the facility with one officer in front of him, two on either side of him, and one officer behind him.  He is briefly stopped and frisked, and then he is taken to the decontamination shower.  After the shower, plaintiff is taken to a room where he is seen by a nurse.  He was then placed in isolation cell 6.  The video does not reflect an opportunity for the officers to assault plaintiff during the

---

[8] In an effort to capture the events, the Court watched some of the video on slow motion.

escort.  Nor is there a break in the recording during which something of that nature could have occurred.

### D.

Plaintiff was criminally charged with assaulting Opoku.  He proceeded to trial in April 2016.  ECF 50-7; ECF 50-10.  A jury in the Circuit Court for Prince George's County convicted Thompson of second-degree assault.  He was sentenced to a term of imprisonment of ten years. *See* ECF 50-11 at 1-10.

Thompson noted an appeal to the Maryland Court of Special Appeals.  In an unpublished opinion (ECF 50-11 at 11-29), the appellate court affirmed.

The appellate court summarized the evidence adduced at trial concerning plaintiff's interaction with Opoku, as follows, *id.* at 12-13:

> In September of 2015, Charles Opoku, a housing unit officer in the Upper Marlboro Correctional Facility, was at his desk in Housing Unit H-15 when an inmate, later identified as [plaintiff], approached the officer and asked him for a pencil.  After Officer Opoku told [plaintiff] that he did not have any pencils, [plaintiff] walked away.  A short time later, [plaintiff ]returned to Officer Opoku's desk and again asked for a pencil.  The officer reiterated that he did not have a pencil.  Despite Officer Opoku's insistence that he did not have any pencils, [plaintiff] returned to the officer's desk several more times.
>
> Eventually, Officer Opoku suggested to [plaintiff] that he borrow a pencil from one of the other individuals in the housing unit.  At this point, [plaintiff] "became more aggressive" and "started insulting" Officer Opoku.  The officer then asked [plaintiff] to "step back in his cell," but [plaintiff] refused.  When Officer Opoku indicated that he was going to have all the other inmates return to their cells so that he could deal with [plaintiff] in isolation, [plaintiff] "decided to go inside."  [Plaintiff] then walked toward his cell, which was located on the level above where the incident occurred.  Officer Opoku and another correctional officer, Aeisha Haynes, followed [plaintiff] up a flight of stairs toward his cell.
>
> As he was walking up the stairs, [plaintiff] repeatedly told Officer Opoku to "go ahead and hit me," and Officer Opoku responded by telling [plaintiff] to step into his cell.  Prior to reaching the top of the stairs, [plaintiff] stopped walking, at which time Officer Opoku brushed past [plaintiff] to "stand on a

different side." When Officer Opoku reached the top of the stairs, [plaintiff] said, "hit me first." The officer again responded by telling [plaintiff] to get into his cell. [Plaintiff] then struck Officer Opoku, rendering him unconscious. Officer Opoku eventually regained consciousness after being transported to an ambulance by an emergency response team.

## II.     Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[9]

---

[9] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

---

instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp*., 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), reversed on other grounds, *Gardner v. Ally Financial Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment

is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

**A.    Section 1983**

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir. 2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266,

271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Co. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

## B.     Opoku, Haynes, and T. René

Plaintiff asserts claims of excessive force and conspiracy to deprive him of his civil rights. However, the undisputed facts demonstrate that Opoku was a victim of an assault by plaintiff and in no way participated in the events that took place afterward, as Opoku was taken out of the detention center to the hospital for treatment of his injuries.[10]

Additionally, the undisputed facts demonstrate that defendant Haynes's only participation in the incident was as a witness to the assault on Opoku, after which she pushed plaintiff into his cell. ECF 50-23 at 5-7 (incident report by Aiesha Haynes). Haynes's conduct, even assuming she told plaintiff he would be assaulted, does not amount to a deprivation of plaintiff's constitutional rights. *See Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (verbal abuse alone does not support a constitutional claim); *see also Carter v. Morris*, 164 F.3d 215, 219, n.3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim).

Defendant T. René witnessed the incident and heard the orders with which plaintiff allegedly did not comply. But, she did not participate in the cell extraction. Nor is she alleged to have assaulted plaintiff in the days following the incident. ECF 50-13 at 3, ¶¶ 8 & 9.

As to the remaining defendants, as discussed, some participated in the cell extraction and others did not. But, Thompson asserts that there were multiple incidents on two separate dates. On this record, in the light most favorable to Thompson, the remaining defendants are not entitled to summary judgment.

For these reasons, Opoku, Haynes, and T. René are entitled to summary judgment.

---

[10] To the extent that plaintiff claims he was assaulted by Opoku and he was acting in self-defense, the claim is barred by the holding in *Heck v. Humphrey*, 512 U. S. 477, 487 (1994) (holding 42 U.S.C. §1983 claims impugning the legality of criminal conviction are not cognizable unless conviction is reversed). Plaintiff mounted a self-defense claim at his criminal trial and he was nevertheless convicted of second-degree assault.

**C.    Exhaustion of Administrative Remedies**

Defendants raise the affirmative defense that plaintiff has failed to exhaust his administrative remedies.  ECF 50-1 at 17-18.  If plaintiff's claim has not been properly presented through the administrative remedy procedure it must be dismissed, pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.  The PLRA provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants.  *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).  Nevertheless, a claim that has not been exhausted may not be considered by this court.  *See Bock*, 549 U.S. at 220.  In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1857 (2016).  Therefore, a court ordinarily may not

excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining"[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

However, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross*, 136 S.Ct. 1850, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 1855.

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal

appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. On the other hand, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008).

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Under the policy in place at the Prince George's County Detention Center, inmates are advised to first seek informal resolution of their grievances and, if an informal resolution cannot be reached with either the housing unit officer or the zone commander, inmates are directed to "request an Inmate Grievance Form." ECF 50-4 at 107 (Inmate Handbook: Grievance Procedure). Inmates are further instructed to complete the form and, at the time it is filed, they are to receive a copy of the form. *Id.*

As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). But, plaintiff asserts that he was refused access to the forms and that officers incorrectly

told him the forms were not given out to inmates, despite the policy which requires all employees to be responsible for supplying the forms. ECF 50-4 at 113, ¶8(a) (policy); ECF 50-12 at 5-6 (plaintiff's letter to Director McDonough). In his Affidavit supporting his opposition, plaintiff states that he was interviewed by Sgt. S. Matthew on June 17, 2016, and he was never provided with a response from which he could appeal. ECF 54-1 at 8, ¶¶54, 56.

Defendants argue in their reply that plaintiff states he exhausted his administrative remedies. ECF 58 at 6-7. But, the argument plaintiff actually makes is that the remaining process for exhausting administrative remedies was unavailable to him. Defendants have failed to establish, beyond a cursory recitation of what plaintiff allegedly failed to do regarding exhaustion, that plaintiff had the opportunity to comply with the procedures in place. Accordingly, at this juncture, and on this record, the suit cannot be dismissed on the ground that plaintiff failed to exhaust.

## D.    Fourteenth Amendment Claim

The Due Process Clause of the Fourteenth Amendment protects the constitutional rights of a pretrial detainee. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating, *inter alia*, that if the defendant "was a pretrial detainee rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, 'mandates the provision of medical care to *detainees* who require it'") (emphasis added in *Brown*) (citation omitted); *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992). Notably, "[p]retrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463

U.S. 239, 243-44 (1983)); *see Bell*, 441 U.S. at 545; *Patten v. Nichols,* 274 F.3d 829, 834 (4th Cir. 2001).

In other words, "[t]he constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment." *Barnes v. Wilson*, 110 F.Supp.3d 624, 629 (D. Md. 2015) (citing *Bell*, 441 U.S. at 535); *see Brown*, 240 F.3d at 388 ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)). Because the rights afforded a pretrial detainee under the Fourteenth Amendment are coextensive with those afforded to a convicted prisoner under the Eighth Amendment, I shall review the excessive force claim by reference to both the Eighth Amendment and the Fourteenth Amendment.

The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). Notably, the Amendment "proscribes more than physically barbarous punishments." *Estelle*, 429 U.S. at 103. It "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . . .'" *Id.* at 102 (citation omitted). Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The protection conferred by the Eighth Amendment also imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The Eighth Amendment is violated when an inmate is subjected to "'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg*, 428 U.S. at 173).

Notably, "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley*, 475 U.S. at 319-20). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

In *Graham v. Connor*, 490 U.S. 386 (1989), the touchstone case with respect to excessive force claims under § 1983, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Id.* at 393. The Court held that claims for the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against "unreasonable" seizures; claims of excessive force against a convicted prisoner are governed by the Eighth Amendment's prohibition of "cruel and unusual punishment"; and claims of post-arrest excessive force against an arrestee or pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits "the use of excessive force that amounts to punishment." *Id.* at 394 & n.10.

The contours of a prisoner's constitutional right to be free from excessive force at the hands of corrections staff has long been established. As the Fourth Circuit recently reiterated in regard

to an Eighth Amendment excessive force claim, such a claim "involves both an objective and a subjective component." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). The objective component does not set "a high bar," and "asks whether the force applied was sufficiently serious to establish a cause of action." *Id.* The subjective component "asks whether the officers 'acted with a sufficiently culpable state of mind[.]'" *Id.* (citation omitted). And, "this is a demanding standard." *Id.*

For a detainee to state a claim of excessive force in violation of the Fourteenth Amendment, the plaintiff may prevail upon evidence that "the use of force is deliberate – *i.e.*, purposeful or knowing." *Kingsley v. Hendrickson*, _U.S._, 135 S. Ct. 2466, 2472 (2015). The claim need not detail the alleged assailant's subjective state of mind. Rather, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473; *see also Dilworth v. Adams,* 841 F.3d 246, 255 (4th Cir. 2016). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham*, 490 U.S. at 396).

Notably, the determination is made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 135 S.Ct. at 2473. And, a court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility'. . . ." *Id.* (quoting *Bell*, 441 U.S. at 540).

Similarly, to establish an Eighth Amendment violation for use of excessive force, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams*, 77 F.3d at 761. With respect to the subjective element, an inmate must show that the prison guards used force "maliciously and sadistically for the very purpose of causing

harm," rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal quotations and citations omitted). In other words, to show that a defendant acted with a "sufficiently culpable state of mind" (the subjective component), *Wilson,* 501 U.S. at 298, a plaintiff must show "wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7; *see Whitley*, 475 U.S. at 320-21. In making this assessment, a court considers several factors: " '(1) the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat; and (4) 'any efforts made to temper the severity of a forceful response.'" *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley,* 475 U.S. at 321).

The extent of injury is a factor indicative of whether the force used was necessary in a particular situation. But, the absence of significant injury is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (per curiam). "[A]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

If "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. In that circumstance, "no particular extent of physical injury is required to establish an excessive force claim . . . ." *Sawyer v. Asbury*, 537 Fed. App'x 283, 290 (4th Cir. 2013). On the other hand, "'not every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9).

### 1. September 28, 2015 Cell Extraction

Defendants claim that plaintiff was combative, tried to assault members of the ERT, failed to comply with lawful orders, and had to be pepper-sprayed and stricken in order for the ERT to gain control and so that Thompson would release his grip on one member of the team. *See* ECF 50-4 at 37 (Interview transcript of Derrick Garnett); ECF 50-14 at 2-4, ¶9 (Affidavit of Moore), ¶ 9; ECF 50-21 at 1-3 (Affidavit of J. René); ECF 50-21 at 5-10 (Interview transcript of J. René), lines 96-7.

It appears undisputed that plaintiff did not comply with orders to back away from the door and lay down on the floor with his hands behind his back prior to the ERT coming into the cell. *See* ECF 54-1 at 3, ¶17; ECF 50-4 at 37; ECF 50-13 at 3, ¶¶ 8, 9; ECF 50-18 at 5; ECF 50-21 at 3, ¶¶ 8, 9. But, plaintiff disputes that he was combative when the officers entered his cell. He also claims that he dropped down to the floor and balled himself up to protect his face. ECF 54-1 at 3, ¶19.

As indicated, there is some video evidence in this case. In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court determined that, when "opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts. . . ." *Id.* at 380. Rather than relying on "visible fiction" propounded by the party whose account is contradicted by the video evidence, a court should "view[] the facts in the light depicted by the videotape." *Id.* at 381.

But, in *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011), the Fourth Circuit made clear that the principle articulated in *Scott* does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers *some*

support for [the other side's] version of events." *Id.* at 276 (emphasis in original). Moreover, the video, like other facts, is reviewed in the light most favorable to the nonmovant. *Brooks*, 924 F.3d at 111. Nevertheless, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court" when resolving a motion as a matter of law, "if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d. Cir. 2007) (applying *Scott* in context of motion for judgment as a matter of law).; *see also Sawyer*, 537 Fed. App'x at 291.

The body camera video appears to support plaintiff's assertion that as soon as the door was opened he went down to the floor and attempted to protect himself. ECF 50-8.

Defendants also maintain that plaintiff had injured his neck before the incident of September 28, 2015. *See* ECF 50-1 at 10 ("Plaintiff did not complain of back or neck injuries until several days later, and his medical records noted a preexisting injury to the upper back."). Defendants cite to the medical records attached to their Motion to support this argument. However, nothing contained in the medical records cited by defendants states that plaintiff sustained a neck injury prior to his arrival at the detention center. *See id.* (citing ECF 50-27 at 3, 25–49, 53, 80, 84). The only indication that plaintiff had a preexisting condition is his complaint of August 31, 2015, that his "back hurts," and he told the provider he suffered a stab wound to his upper back nine years prior. ECF 50-27 at 3. Defendants also appear to rely on the absence of plaintiff's complaint of pain to his neck prior to October 1, 2015, when he told medical staff his neck and jaw were injured. *Id.* at 39.

In his opposition, plaintiff relies on the Declaration of Meskerem Asresahegn, M.D., submitted in support of the Medical Defendants' dispositive motion. ECF 54-2 at 18-22. Dr.

Asresahegn stated in pertinent part, "Delayed-onset pain after an injury is not unusual. Immediately following injury or trauma, the body releases adrenaline and endorphins that may mask pain and/or symptoms of an injury." *Id*. at 20.

The serious injuries plaintiff suffered, consisting of fractures to the spinous process at C7-T1 and a broken nose, raise credibility questions regarding when those injuries occurred and how they were inflicted. Further, the court notes that the injuries appear to have been reported by plaintiff after the cell extraction and also after the alleged assaults on September 29, 2015.

Whether the ERT members used reasonable force upon entry into the cell, or instead engaged in a malicious, revengeful attack, is a genuine dispute of material fact. As in the Fourth Circuit's recent decision in *Brooks*, 924 F.3d at 113, the subjective component, *i.e.*, the motive of the officers, is hotly disputed here. And, it is not appropriate on summary judgment for this Court to determine whether the officers engaged in reasonable conduct or, instead, malicious use of excessive force.

Accordingly, I shall deny summary judgment as to the claims asserted against the Correctional Defendants who were members of the ERT and who appear to have participated in the cell extraction: Gadson, Morgan, Garnett, and Moore.

### 2. September 29, 2015 Assaults

Plaintiff raises claims against defendants Stanback, Jackson, and Lewis that, if true, support a finding of a Fourteenth Amendment violation. There is no evidence that on the day following plaintiff's assault on Opoku that there arose any need for use of force against him. Rather, taking plaintiff's allegations as true, as this court must on summary judgment, the officers engaged in acts of revenge which, if true, would amount to a deliberate and purposeful use of force without justification.

In their affidavits, Stanback, Jackson, and Lewis deny their involvement in the events that took place on September 28, 2015. ECF 50-17 at 2, ¶5; ECF 50-16 at 2, ¶6; ECF 50-15 at ¶¶6 & 7. Lewis adds that he had no physical contact with plaintiff "on any occasions subsequent to the incident wherein force was used." ECF 50-15 at ¶7. But, there is a lack of any substantive response with regard to the detailed claims raised by plaintiff against these defendants as to September 29, 2015.

Where, as here, defendants offer no justification for the alleged application of force or deny there was an application of force, there exists a genuine dispute of material fact that requires credibility determinations not appropriate for resolution on summary judgment. *See Anderson*, 477 U.S. at 255. Accordingly, I shall deny summary judgment as to the claims against Stanback, Jackson, and Lewis.

**E.     Qualified Immunity.**

Defendants contend that they are entitled to qualified immunity. On this basis, they urge the court to dismiss the suit as to them.

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto*, 841 F.3d at 235; *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 395 (4th Cir. 2014), *cert. denied*, 575 U.S. 983 (2015). Indeed, the Fourth Circuit recently reiterated: "'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Livingston v. Kehagias*, ___ F. App'x ___, 2020 WL 898082, at *3 (4th Cir. Feb. 25, 2020) (quoting *Pearson v. Callahan*, 552 U.S. 223, 23 (2009) (internal quotation marks omitted)).

The doctrine of qualified immunity "'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018) (quoting *Pearson*, 555 U.S. at 231); *see also Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The cases are legion in support of these principles. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. ___, 137 S. Ct. 577, 589 (2018); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability

for "'bad guesses in gray areas'") (citation omitted). In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818. Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Of relevance here, qualified immunity is an "'*immunity from suit* rather than a mere defense to liability[.]'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d, 374, 377 n.2 (4th Cir. 2007) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of*

*Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray v. Roane*, 948 F.3d 222, 226 (2020); *Owens*, 767 F.3d at 395-96. The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Ray v. Roane*, 948 F.3d 222, 226; *Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

There is no issue as to whether the right was clearly established. It has long been established that a prison guard cannot gratuitously strike a prisoner. This was well established at the relevant time. But, of import here, there is a genuine "question of material fact" as to whether "'the conduct allegedly violative of the right actually occurred," and this critical question "must be reserved for trial.'" *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (citation omitted); *see Ray*, 948 F.3d at 228-29; *cf. Livingston*, 2020 WL 898092.

Therefore, defendants are not entitled to dismissal of the suit based on the doctrine of qualified immunity.

## F.     1985 Conspiracy Claim

Plaintiff raises a claim of Civil Conspiracy under 42 U.S.C. § 1985(3). It provides, in pertinent part:

> If two or more persons in any State or Territory conspire [to] . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages

40

occasioned by such injury or deprivation, against any one or more of the conspirators.

"To avoid interpreting Section 1985(3) as a general federal tort law, the Supreme Court has emphasized that, as under Section 1981, the plaintiff must prove as an element of the cause of action 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Dennis v. Thurman*, 959 F. Supp. 1253, 1263 (C.D. Cal. 1997) quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  Plaintiff has not alleged nor offered any evidence to support that defendants engaged in a conspiracy with the required animus to support a claim under § 1985(3).  Accordingly, this claim shall be dismissed.

A separate Order follows, denying in part and granting in part defendants' Motion.


February 28, 2020 ___
Date

                              _____/s/_____
                              Ellen L. Hollander
                              United States District Judge